IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>JONATHAN RAMONE FRANKLIN,<br><br>　　　　　　Defendant. | 8:17CR374<br><br>FINDINGS AND RECOMMENDATION |

　　　　This matter is before the Court on Defendant Jonathan Ramone Franklin's Motion to Suppress ([Filing No. 63](#)). An evidentiary hearing was held in this matter on March 28, 2018. A transcript of the hearing was filed on April 6, 2018. ([Filing No. 71](#).) This matter is now ripe for disposition.

　　　　Having considered the evidence presented and arguments made, the undersigned will recommend that the motion be denied.

## FACTS

　　　　On November 22, 2017, a robbery occurred at the Security Home Bank in Malmo, Nebraska. A black male, wearing a dark blue sweatshirt and stocking cap, entered the bank carrying a handgun and demanded money. (Ex. 1.)

　　　　At approximately 8:44 a.m., an individual called 911 reporting that the bank had just been robbed at gunpoint by a black male. (Ex. 1.) The caller advised that another black male, driving a newer blue Chevy Malibu, had dropped the robber off at the bank. The caller stated that the car took off south, and that the robber ran around the back of the bank to the north and west. The information broadcast to law enforcement was: Robbery, Malmo, Security Bank, two black males in a Chevy Malibu. (Ex. 1; 3:03-3:24.) No plate number for the vehicle was given. (TR. 31.)

Sanders County Deputy Sherriff Tom Janecek ("Officer Janecek") was at the Sheriff's Office in Wahoo doing reports when the dispatch supervisor came into the back room and stated that there had been a holdup at the bank in Malmo. (TR. 4.) He left the Sheriff's Office in his cruiser and headed towards Malmo. (TR. 5.) Officer Janecek then made contact with Police Chief Ken Jackson ("Officer Jackson") and Officer Ryan Martin ("Officer Martin"). The officers decided that Officer Jackson and Officer Martin would stay near the intersection of Highway 92 and Highway 77, and that Officer Janecek would travel west towards Malmo. (TR. 42.)

While Officer Janecek was traveling westbound on Highway 92, he observed a blue vehicle with a black male driver heading eastbound. (TR. 14.) Officer Janecek indicated that as the car went by him, it appeared to be a Chevy Malibu. (TR. 15.) Officer Janecek first observed the Malibu approximately four minutes after the broadcast from dispatch. Officer Janecek turned around to follow the Malibu. (TR. 14.) As he followed the vehicle, he called in the plate number. (TR. 15.) Dispatch indicated the plates matched the car and there were no warrants on the vehicle. (TR. 15.) Officer Janecek did not observe any traffic violations. (TR. 33.)

As the Malibu approached the Highway 92/Highway 77 intersection, Officer Janecek initiated a traffic stop.[1] The traffic stop occurred at approximately 8:48 a.m. (TR. 30.) Officer Janecek testified that about eight to ten vehicles had passed him at the time he first observed the Malibu, and that he pulled over the first vehicle that matched the description given by dispatch. (TR. 32-33.) Once the vehicle pulled over, Officer Janecek told the driver, who was later identified as Defendant, to shut off the vehicle and stick his hands out of the window. (TR. 22.) Defendant complied. (TR. 22.) Officer Janecek then told Defendant to reach out the window and open the door. Again, Defendant complied. (TR. 22.) Officer Janecek instructed Defendant to get out of the car, face away from the officers, and walk backwards towards them. (TR. 22.) Defendant complied, and kept walking backwards. (TR. 22.) Deputy Janecek testified that it

---

[1] Officer Janecek had a camera system in his cruiser, but it was not turned on because he was in the station working on reports. (TR. 20.) Officer Janecek testified that he turns the camera off when he is in the station so the batteries do not get drained. (TR. 20.) There is a process to turn the camera back on and you have to enter a user ID number and password, which can take about two to three minutes. (TR. 20.)

2

was like Defendant was a step ahead of him when he was giving commands. (TR. 22.) Deputy Janecek indicated the fact that Defendant seemed a step ahead of officers was significant because it appeared Defendant had gone through this process before. (TR. 23.)

Once Defendant made it back to the officers, he was handcuffed. (TR. 22.) Defendant told the officers that there was no one else in the vehicle. (TR. 23.) However, due to the report that there were two individuals involved in the robbery, the officers approached the vehicle to make sure no one else was inside. (TR. 23.) The officers did not observe anyone inside the vehicle, but they decided to open the trunk to look for other occupants. (TR. 46-48.) At this point, the officers only looked in the trunk. They did not manipulate any items in the trunk. (TR. 24, 48.)

The officers asked Defendant where he had come from. (TR. 29.) Defendant said had been in Lincoln, but got lost and ended up in the area. (TR. 29-30.) The officers told Defendant that there was a bank robbery and that he and his vehicle matched the description of those involved. (TR. 24-25.) The officers asked Defendant for permission to search the car, and Defendant provided consent. Defendant was not advised of his *Miranda* rights at that time. (TR. 25.) No officers threatened Defendant to get him to consent to the search. (TR. 25.) No promises or misrepresentations were made to Defendant, and Defendant did not appear confused or impaired. (TR. 25-26.) Defendant did not have problems walking, and officers could understand him. (TR. 26.) It was about three minutes from the time of first contact until officers asked Defendant to search the vehicle. (TR. 27.)

The officers searched the passenger compartment of the vehicle. (TR. 27.) The officers did not find any weapons, but they did see a cell phone sitting on the center console of the vehicle with Google Maps on it, which showed the starting point was Malmo. (TR. 27.) Deputy Janecek searched the trunk and found a lime green backpack, some clothing and a ski mask. (TR. 28.) When Deputy Janecek picked up the ski mask, he noticed it was extremely heavy. (TR. 28.) Deputy Janecek opened the ski mask and found two pistols. (TR. 28.) Defendant never requested that the officers stop searching the vehicle. (TR. 29.)

3

## DISCUSSION

### 1. Traffic Stop

"An officer may conduct a Fourth Amendment stop to investigate a crime only if the officer has a reasonable suspicion that the person had committed or was committing a crime." *United States v. Juvenile TK*, 134 F.3d 899, 902 (8th Cir. 1998) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion exists if the officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[s] suspicion that a crime [is] being committed." *United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (quotations omitted). The court looks to the totality of the circumstances when determining whether reasonable suspicion exists. *Id*. The Eighth Circuit Court of Appeals has found that "[w]hen a traffic stop is based on a radio dispatch, factors such as 'the temporal and geographic proximity of the car to the scene of the crime, [a] matching description of the vehicle, and the time of the stop' are highly relevant to a finding of a reasonable suspicion." *United States v. Daniel,* 887 F.3d 350, 354 (8th Cir. 2018) (quoting *Juvenile TK*, 134 F.3d at 903)).

The Eighth Circuit recently decided a case involving similar facts. In *Daniel*, an individual called 911, reporting that she had just been robbed at gunpoint. The caller stated that she believed that the suspect had left in a white Suburban being driven by another person. The caller described the suspect's clothing, race, and the color of the gun the suspect had pointed at her. The dispatcher relayed this information to law enforcement, and an officer proceeded to the scene of the robbery. After a couple of blocks, and within minutes of dispatch, the officer observed a white Suburban driving in the opposite direction in the oncoming lane. Even though the officer did not observe any traffic violations, he activated his lights and pulled over the Suburban. The stop occurred late at night when there was very little traffic on the roadway. Following the stop, the vehicle was searched and evidence linking the driver to the robbery was recovered. On appeal, the driver contended that the officer did not have reasonable suspicion to stop the Suburban. The Eighth Circuit disagreed, finding that the temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop supported reasonable suspicion.

4

Here, a 911 caller reported that the bank had just been robbed at gunpoint by a black male. The caller advised 911 that another black male, driving a blue Malibu, had dropped the robber off at the bank. Dispatch advised officers to be on the lookout for a blue Malibu with two black occupants. Officer Janecek heard the broadcast and headed towards Malmo. Approximately four minutes after receiving the report from dispatch, Officer Janecek observed a blue Malibu being driven by a black male. The temporal and geographic proximity of the Malibu to the scene of the robbery, as well as a matching description of the vehicle, provided reasonable suspicion for the stop.

### 2. Search of the Vehicle

The evidence shows that the search of the vehicle was proper. As an initial matter, the officers were justified in performing a protective search of the passenger compartment and trunk of the Malibu. "During a *Terry* stop, officers can check for weapons and may take any additional steps that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Thomas*, 249 F.3d 725, 728 (8th Cir. 2001) (internal citations omitted). The officers had reasonable suspicion to believe that Defendant and the Malibu were just involved in an armed robbery. The officers were acting on information that two individuals had left in the Malibu. In order to protect their safety during the stop, the officers needed to ensure that other individuals would not be emerging from the Malibu. The protective search of the vehicle was limited to looking for individuals. The officers did not manipulate any items in the trunk. The officers conducted a lawful protective search of the vehicle.

Defendant later consented to the search of the entire vehicle, and the evidence shows that Defendant's consent was voluntary. Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990) (quotation omitted). The following characteristics of persons giving consent are relevant in assessing voluntariness: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether,

5

because they had previously been arrested, they were aware of the protections afforded to suspected criminals by the legal system. *Id*. at 381. When evaluating the voluntariness of a search, courts also examine the environment in which consent was given. Generally, courts consider whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened or physically intimidated; (3) relied upon promises or misrepresentations by police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred. *Id*.

Considering the totality of the circumstances, it is clear that consent was freely and voluntarily given. Consent was obtained very soon after the traffic stop. The officers did not intimidate Defendant or make any promises to obtain consent, nor did the officers make any misrepresentations. Defendant did not appear confused or impaired. Defendant did not have problems walking, and officers could understand him. Although Defendant was not advised of his *Miranda* rights before providing consent, Defendant was experienced with the criminal justice system. (Filing No. 10; pages 2-3.) Moreover, Defendant did not attempt to withdraw consent at any time.

For these reasons, the undersigned will recommend that the Motion to Suppress be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress (Filing No. 63) be denied.

Dated this 2nd day of May, 2018.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

6

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.